## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ABBEY ZINK, PH.D. | ) | Case No. 2:22-cv-01170-WSH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | The Hon. W. Scott Hardy |
| | ) | U.S. District Judge |
| THE PENNSYLVANIA STATE | ) | |
| SYSTEM OF HIGHER EDUCATION, | ) | |
| SLIPPERY ROCK UNIVERSITY | ) | |
| OF PENNSYLVANIA, and | ) | |
| WILLIAM BEHRE, | ) | FILED ELECTRONICALLY |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## AMENDED COMPLAINT IN CIVIL ACTION

AND NOW comes Plaintiff, Abbey Zink ("Dr. Zink" or "Plaintiff"), by and through undersigned counsel, and files this Amended Complaint in Civil Action, stating as follows:

### I. PARTIES

1.      Dr. Zink is an adult individual currently residing in Butler County, Pennsylvania.

2.      Defendant Pennsylvania State System of Higher Education ("PASSHE") is a state agency with its principal place of business at 2300 Vartan Way, Suite 207, Harrisburg PA 17110.

3.      Defendant Slippery Rock University of Pennsylvania ("SRU") is a state-owned institution of higher education and a constituent of PASSHE with its primary place of business at 1 Morrow Way, Slippery Rock, PA 16057.

4.      Defendant William Behre ("Dr. Behre") is currently the President of SRU and has his primary place of business at 1 Morrow Way, Slippery Rock, PA 16057.

5.      Dr. Zink is a former employee of SRU and PASSHE who in her role as SRU Provost reported directly to President Behre.

## II.  JURISDICTION

6.      The jurisdiction of this Court over the matters set forth in this Complaint is founded upon 28 U.S.C. § 1331, 28 U.S.C. § 1367(a), and 31 U.S.C. § 3730(h).

## III.  VENUE

7.      The events related in this Complaint occurred in Butler County, Pennsylvania, in the Western District of Pennsylvania; therefore, venue is appropriate in this Court.

## IV.  ADMINISTRATIVE EXHAUSTION

8.      On June 16, 2022 Dr. Zink filed an administrative charge with the U.S. Equal Employment Opportunity Commission ("EEOC") complaining of discrimination on the basis of race, sex, and age.

9.      Dr. Zink further complained of harassment and retaliation.

10.      Dr. Zink cross-filed the administrative charge with the Pennsylvania Human Relations Commission.

11.      As soon as her claims under the pertinent federal and state anti-discrimination statutes have been exhausted, Dr. Zink will seek leave to file an amended complaint.

## V.  FACTS

12.      Dr. Zink has a bachelor's degree in Journalism and a master's degree in English from Marshall University.

13.      Dr. Zink earned a doctorate in English from Northern Illinois University.

14.      Dr. Zink is an alumna of the Academy for Innovative Higher Education Leadership, a program offered through Arizona State and Georgetown universities; and the Becoming a Provost Academy, a program offered through The American Association of State Colleges and Universities

and the Council of Independent Colleges.

15.     SRU also sponsored Dr. Zink's participation in the AASCU Academy for New Provosts, a year-long leadership program which she completed - now at her own cost-in July 2022.

16.     In December 2019, Dr. Zink was named Provost, Vice President, and Chief Academic Officer for SRU effective June 22, 2020.

17.     Along with the administrative position, Dr. Zink was given tenure as a professor in the English Department.  On Dec. 11, 2019, Dr. Danette Demarco, English Department chair, reported via e-mail to President Behre and others (including Human Resources director Lynne Motyl): "The English department has conducted a tenure vote regarding Dr. Abbey Zink.  The results are a resounding 'yes' to tenure."

18.     Prior to working for SRU/PASSHE, Dr. Zink served as:

        (a)  Dean of the College of Humanities and Social Sciences at Sam Houston State University in Huntsville, Texas;

        (b)  Dean of the College of Arts and Sciences at Texas A&M University-Kingsville, and

        (c)  Interim Dean and Assistant Dean of the School of Arts and Sciences as well as a faculty member at Western Connecticut State University in Danbury, Connecticut.

        (d) She also was tenured faculty member at Western Connecticut State University, Texas A&M University-Kingsville and Sam Houston State University.

19.     Dr. Zink was well-qualified for her positions at SRU.

20.     Dr. Zink was removed as Provost effective April 4, 2022 and terminated April 26, 2022.

21.     While SRU Provost, Dr. Zink served on the President's Cabinet, the Provost's Council, the COVID Response Team, and the PASSHE Chief Academic Officers group.

22.     Dr. Zink served as the Chief Academic Officer with oversight over the Division of Academic Affairs, and was the highest-ranking Cabinet officer and second in command of the University as Provost.

23.     Dr. Zink's areas of responsibility included:

(a)  5 academic colleges and honors program;

(b)  Bailey Library;

(c)  Center for Teaching and Learning (CTL);

(d)  Office of Community Engaged Learning (OCEL);

(e)  Butler SUCCEED (community development and outreach center in nearby Butler City);

(f)  Office of Grants, Research, and Sponsored Programs;

(g)  Office of Assessment and Accreditation, and;

(h)  Information Administrative Technology Services (IT).

24.     Some of Dr. Zink's accomplishments included:

(a)  creating the College of Health Professions and the College of Engineering and Science to highlight SRU's significant role in meeting workforce needs in the greater Pittsburgh region;

(b)  launching university-wide strategic planning initiative;

(c)  implementing a joint-degree program with Quanzhou University of Information Engineering in China;

4

(d)  hosting several successful accreditation visits;

(e)  serving on SRU's COVID Response Team and leading the University's academic response;

(f)  increasing faculty professional development opportunities in the areas of online teaching and inclusive excellence;

(g)  creating Rock Learning Now (an online learning resource for students);

(h)  planning the Fall 2021 launch of Butler SUCCEED-a community engagement and economic development resource center in nearby Butler City;

(i)  advancing several Diversity, Equity, and Inclusion initiatives, including hiring SRU's first Frederick Douglass Institute Scholar and adding a diversity requirement to the Rock Studies gen-ed program;

(j)  completing several large renovation projects in academic facilities.

25.    Dr. Zink worked hard, performed well, and achieved numerous professional accomplishments.

26.    By letter dated February 1, 2022  President Behre provided to Dr. Zink a deserved and highly positive performance evaluation that reads:

> Thank you for your hard work and dedication you your position. As I see it, your year has been a success. I am glad that you are here. Some of the most salient key accomplishments for this past year have been the following.
>
> •    On boarding during a pandemic.
>
> •    Successfully leading an academic affairs unit during the pandemic which included:
>
>     •    Changing modalities;
>     •    Managing anxiety;

- •    Managing disruption;

- •    Ongoing communication with and professional development for faculty.

- •    Maintaining excellent relationships with faculty leadership.

- •    Making strides and focused on building infrastructure in the provost's office for DEI initiatives.

- •    Developing a strong working relationship with key deans and other leaders.

- •    Served very successfully in key systemwide CPP work.

- •    Reviewing current practices with a thoughtful eye.

- •    Managing the creation of a new college during her first year and during a pandemic.

- •    Identifying and addressing key issues with accreditation.

In the coming year, I would like to see you to continue make fostering solid working relationships with all cabinet members a priority. I also think that it is important to fully staff the provost's and deans' offices as quickly as is practical. You have been working with a thin staff, which creates a work environment that is potentially unhealthy for you. I believe that you have a bright future in higher education and would hate to see you burn out due to short staffing. Finally, as you know, making steady progress on the university strategic plan is also a key goal. I am pleased with the progress so far. Please take advantage of your current momentum and keep the process moving.

Abbey, you have come to SRU during what is likely the most challenging time in its history. I appreciate the dedication with which you have focused yourself on solving the issues at hand. You have done so laudably. To the extent possible, please try to pace yourself. It took years for some of our challenges to develop. They will not be resolved overnight.

Good job this year. Thank you.  William J. Behre, President

27.     Dr. Zink also deserved and on February 7, 2022 received a substantial merit based

pay raise of $10,575.

28.     Prior to Dr. Zink's hiring, SRU had launched new programs with a heavy emphasis

6

in the areas of engineering and health professions (not core strengths of the University).

29.     Engineering and health professions programs are extremely expensive programs to launch and maintain, and they require considerable institutional investment in faculty, support staff, and facilities to ensure that student learning outcomes and accreditation requirements are met; they also take years to build, especially in highly competitive markets such as the greater Pittsburgh region.

30.     When these programs were launched, SRU had no experience with engineering or with offering multiple graduate health professions programs with significant individual programmatic needs.

31.     Two of these programs were in mechanical engineering and civil engineering.

32.     Plans to build labs for civil and mechanical engineering were submitted in 2019-20 (prior to Dr. Zink's arrival), but the first phase of laboratory construction did not commence until 2021.

33.     Accordingly, although paying an extra $80 fee per credit, engineering students did not have access to fully functioning labs until the earliest Spring term of 2022.

34.     But in April 2022  construction of the next phase of laboratories needed for the Fall term of 2022, with Aug. 22, 2022 as the first day of classes, had not yet commenced despite Dr. Zink's urging.

35.     In effect, mechanical and civil engineering juniors did not have access to the labs they were promised; in all likelihood, these same students will not have access to fully functioning labs at the start of their senior year.

36.     Dr. Zink became concerned that SRU was not providing the facilities and learning

experience that it promised (in marketing materials and on the University website) to civil and mechanical engineering students.

37.     Juniors in those programs did not have access to fully functional labs for courses in Fall 2021, and some equipment still was not fully functional well into the Spring 2022 semester.

38.     As of April 4, 2022 work on even temporary senior-level labs and capstone spaces needed by August 2022 had not yet begun, and construction of permanent senior-level labs will take 12-18 months to complete.

39.     The University accepts federal financial aid for these programs via Pell grants and federally subsidized student loans.

40.     In addition, the University charges engineering students an extra $80 per credit for engineering courses.

41.     On March 3, 2022  Dr. Zink emailed SRU Trustee Matthew Lautman that she was "deeply concerned that we still don't have a plan to move forward with mechanical and civil engineering labs that students need for Fall 2022," that she was concerned about retaliation, that Dr. Amir Mohammadi ("Dr. Mohammadi"), SRU's then Senior Vice President for Administration, Global Engagement and Economic Development, had been retaliated against for speaking out, and that the engineering students are not getting what they paid for and that the University is at risk for not providing it.

42.     Dr. Mohammadi is a naturalized U.S. citizen who was born in Iran.

43.     On Friday, March 4, 2022  Dr. Zink expressed her concerns to President Behre and copied Dr. Mohammadi that contrary to the University's advertisement guaranteeing engineering labs with state of the art equipment and charging engineering students an additional $80 per credit,

the University had failed to provide engineering students "adequate labs, equipment, or capstone space."

44.     Dr. Zink wrote: "That is just wrong.  Our students deserve our best-have paid extra for our best-and they're not getting it."

45.     Completion of the civil and mechanical engineering labs was a matter of urgency not only for student learning but for accreditation reasons.

46.     The mechanical and civil engineering programs at SRU are not yet accredited by ABET (Accrediting Board for Engineering and Technology).

47.     In effect, as the first cohort graduates, SRU must have the curriculum and facilities in place to attain ABET accreditation for these programs.

48.     After months of delays, Dr. Zink was rightfully troubled by President Behre's lack of concern about or understanding of the urgency of this issue, as students who graduate from unaccredited programs would not have the same career options as students who graduate from other accredited undergraduate programs in civil and/or mechanical engineering in the region such as University of Pittsburgh, Robert Morris University, Youngstown State University, and West Virginia University, to name a few.

49.     In addition to the significant accreditation concerns, Dr. Zink was deeply troubled that SRU mechanical and civil engineering students without access to fully functioning labs in their junior and senior years would be at a professional disadvantage in the workplace.

50.     Dr. Zink was particularly concerned about President Behre's lack of interest in such a serious issue because of SRU's near misses with accreditation issues in the Master of Science in Physician Assistant (PA) and Master of Social Work (MSW) programs during President Behre's

administration.

51.     The PA program was placed on probation after successfully appealing a more severe finding in March 2020 (prior to Dr. Zink's arrival) and removed from probation in March 2022 (through Dr. Zink's efforts as Provost).

52.     In Spring 2022 Dr. Zink assured the PA accrediting team that SRU would not increase its cohort size until student attrition and professional exam failure rates were lower.

53.     When debriefing the PA accreditation visit with Dr. Behre, Dr. Zink shared her assurances to the accreditors about maintaining current (smaller) cohort size.

54.     As soon as the PA probation was removed, however, President Behre directed Dr. Zink to develop plans to increase the size of the annual PA admissions cohort while acknowledging that too many current PA students still were struggling.

55.     In conversations with Dr. Zink, Council on Social Work Education staff members shared that about 75 percent of most new MSW programs do not begin admitting students until they have achieved candidacy status, so that no harm will come to students should there be issues. Graduation from an accredited program is a requirement for licensure in most states.

56.     The decision to admit MSW students and to allow them to enroll in classes prior to candidacy was made by the Behre administration before Dr. Zink's arrival and further illustrates an established pattern of underestimating the complexity of a new program while needlessly putting students at risk.

57.     Dr. Behre's strategic vision for the University was unclear: SRU touted new programs as key to maintaining its enrollments;  yet, under his leadership, the university did not adequately plan for these expensive and complex new programs.

58.     This mismanagement led to the issues with the mechanical and civil engineering laboratories and the accreditation concerns with the PA and MSW programs.

59.     In spring of 2022 Dr. Behre directed Dr. Zink and the strategic planning committee to develop plans to shrink SRU to 5,000 to 6,000 students from its current 8,424 (Fall 2021)—a vision Dr. Zink later learned had not been shared with several Cabinet members who were visibly upset when they heard this news.

60.     During her tenure as provost, Dr. Zink also shared her concerns repeatedly with President Behre about the high number of student complaints in the PA program—some so serious that PASSHE legal was involved.

61.     The dismissal and attrition rates were much higher than should be acceptable; Dr. Zink was especially concerned about the students dismissed from the program in their final year for not passing the required Physician Assistant Education Association ("PAEA") End of Rotation Exams ("EORE").

62.     In effect, these students completed their courses and clinical requirements, but could not pass the EOREs required for graduation.

63.     Under Dr. Behre's leadership, SRU spent nearly $1 million (including $500,000 specifically for engineering) on consulting services to assist the university in developing a facilities master plan ("FMP").

64.     The need for an FMP was discussed at the cabinet retreat in summer 2021, but there was no forward movement in finalizing and implementing such a plan.

65.     On most campuses, the FMP is an essential guiding document that includes all expected construction and renovation projects with specific timelines for completion; the point of

11

using an FMP is to ensure that students' learning needs are met and that scarce resources are not needlessly wasted.

66.     In 2021-22, SRU not only did not have an operational FMP, but was no longer listing expected engineering lab construction costs in the CPP or in information provided to the Council of Trustees.

67.     In conversations with Dr. Zink, President Behre was adamant that the university would not bond (*e.g.*, finance) these engineering lab construction costs; thus, the only alternatives were the use of reserves or fund-raising.

68.     By April 2022  no significant private or corporate monies had been secured to pay for the construction of these labs and related costs of moving the Physical Therapy program to Harrisville with an estimated cost of over $20 million as originally conceived by Interim Provost Chmielewski in 2019-20; accordingly, reserves would have to be used.

69.     The omission of the costs of the labs in the CPP overstated the University's reserves by millions —a move that put the University's finances in a more favorable light.

70.     In an e-mail to Dr. Zink on March 24, 2022 Chief Financial and Data Officer Carrie Birckbichler ("Ms. Birckbichler") confirmed that, "Yes, reserves will drop when funds are expended for construction and equipment purchases […]."

71.     Profits from the PA program were used to offset losses in unprofitable academic programs across the University.

72.     In January 2021, due to lack of supervision of the initial accreditation submission by the Office of Accreditation and Assessment, which then reported to Ms. Birckbichler (in her role as Chief Financial and Data Officer), the MSW was in serious jeopardy of not gaining candidacy for

12

accreditation-an issue so grave that students in SRU's program likely would not have been able to transfer their SRU credits to other accredited programs.  Graduation from an accredited MSW program is a licensure requirement in most states.

73.    Indeed, SRU contemplated halting admissions to the MSW so that no further students would be adversely affected.

74.    Through Dr. Zink's intervention, the MSW program received extra time to submit its initial report and had a successful accreditation visit later in the spring.

75.    At the time, President Behre said he was surprised by the MSW problems because he thought that social work was one of the "easiest accreditations" to attain.

76.    In fact, the Council of Social Work Education is among the most rigorous accreditors.

77.    These near misses finally convinced President Behre of the need (as Dr. Zink had advocated for months) for 1) moving the Office of Accreditation and Assessment back to Academic Affairs; and 2) creating the College of Health Professions to provide focused attention to the needs of so many new health professions programs.  A dean with specific health professions experience was needed to lead the college.

78.    By Spring 2022 however, President Behre's commitment to fully supporting the new College of Health Professions had decreased dramatically—a clear indication that President Behre still did not fully understand or even care about the unique complexities of offering so many graduate health professions degrees.

79.    With eight years of academic leadership experience at doctoral research institutions, Dr. Zink was alarmed by the seriousness of these accreditation issues and realized that SRU, under President Behre's leadership, did not have the accreditation culture necessary to support the

University's addition of engineering as well as its expansion of health profession programs, nor was President Behre committed to creating such a culture.

80.    Dr. Zink's efforts to improve processes related to accreditation and planning were met with indifference or hostility.

81.    Nearly every conversation that Dr. Zink had with President Behre and other Cabinet members about the number and seriousness of these issues devolved into her fellow administrators blaming decisions made by former President Cheryl Norton ("President Norton") and former Interim President and Provost Philip Way ("Dr. Way").

82.    President Norton retired in June 2017, while Dr. Way left SRU in summer 2019 to serve as president of Athens State University.

83.    Such blaming of past administrators was not productive or relevant in addressing current issues but was part of a pattern of deflection employed and encouraged by President Behre that led to organizational inertia and dysfunction.

84.    Engineering was a particular bone of contention among administrators; President Behre approved the launch of the mechanical and civil engineering programs early in his administration against advice from at least one senior Cabinet member, Dr. Mohammadi. Repeatedly, other administrators questioned the decision to add engineering to Slippery Rock University. Such questioning, however, was not relevant to serving the students already enrolled in these programs who need to graduate from ABET-accredited programs to have the same career opportunities as graduate from established ABET-accredited programs in the region. Questioning aside, SRU had added engineering to its portfolio and had made commitments to students enrolled in these programs. Not fulfilling these commitments not only would harm students who enrolled in

these programs, but also put the university at serious financial risk.  Moreover, the University continued to admit new students into these programs.

85.     The lack of plans or decision-making regarding the next phase of the mechanical and civil engineering labs were well within an established pattern by President Behre and his administration to react rather than plan.

86.     This reckless mindset continued in Spring 2022 with President Behre reportedly suggesting to a staff member that admissions only show the "nice" labs to prospective engineering students on campus tours.

87.     Previously, on September 13, 2021, SRU submitted its Comprehensive Planning Narrative ("CPP") to PASSHE.

88.     On September 24, 2021, during a SRU Council of Trustees meeting, Trustee Jeff Smith asked about CPP financials; President Behre said it is an absurdity to meet the balanced budget requirement.

89.     The CFO, Ms. Birckbichler, "balanced" the budget through projected (but not feasible) elimination of over 30 full time faculty positions skewing the CPP projections by several million dollars to favor SRU, as well as significantly decreasing institutional financial aid.

90.     On November 12, 2021, Trustee Smith asked if the University lied to PASSHE; President Behre responded that the PASSHE knew exactly what was being reported, and they were fine with it.

91.     As part of questioning by Trustee Smith, Behre also admitted that the projected dramatic decrease in institutional financial aid to students was not real.

92.     Dr. Behre and Ms. Birckbichler (then Chief Financial Officer) actually floated the

15

idea of keeping two sets of financial books: one that would include more rosy figures that would be presented to the PASSHE administration and another that would include more accurate figures.

93.     Ms. Birckbichler later would present Dr. Zink with accurate financial data (without the projected costs of the mechanical and civil engineering labs) but would caution her that these figures were not for public dissemination.  This caution made no sense to Dr. Zink, as SRU is a public institution doing the public's business with public funds and was yet another financial red flag in Dr. Zink's mind.

94.     As was her duty, Dr. Zink asked Cabinet-level, difficult questions about finances, enrollment, and diversity to SRU Administrators, including Ms. Birckbichler and Chief Enrollment Management Officer Dr. Amanda Yale.  Dr. Mohammadi did as well.

95.     On February 21, 2022 Dr. Mohammadi sent a letter to the PASSHE Chancellor's office about concerns regarding the engineering program and CPP.

96.     Instead of hiring an independent firm (or bidding out for the job), PASSHE simply hired its usual auditing firm (CliftonLarsonAllen) to look into the allegations.  On June 3, 2022, the Slippery Rock University Council of Trustees unanimously passed a resolution requesting that the Board of Governors direct PASSHE Chancellor Greenstein to share the scope and results of the audit with the COT, which has fiduciary responsibility for the university.  Multiple direct requests from Chair Matt Lautman on behalf of the COT to Chancellor Greenstein had been denied.

97.     On March 23, 2022 Dr. Zink was interviewed as a witness by Ayla Grady and another individual from CliftonLarsonAllen as part of the investigation.

98.     The interview explored issues related to financial misrepresentations wilfully submitted to PASSHE and the Council of Trustees as well as the history of funding the engineering

16

facilities.

99.     President Behre was aware of this interview and Dr. Zink's role as a witness in the investigation.

100.     On March 24, 2022 Dr. Zink sent a lengthy email to President Behre expressing further budget issues and concerns, including that:

•     The Butler SUCCEED account is/was empty, so there wasn't enough money put in there to cover rent and utilities for a year.  The Butler SUCCEED landlord also complained about not being paid for several months.  The cleaning service for Butler SUCCEED also wasn't paid for several months.  Late payment to small businesses should be unacceptable.

•     Money that always has been set aside to fund recurring internal student-faculty research projects also wasn't/isn't in the account.

•     Academic Affairs was not given enough funds to pay The Registry for John Bonaguro's[1] services.  That account is several months' short in funds.  The University knew in advance what we owe The Registry, so this doesn't make sense.

•     A routine maintenance request (for a building shared between Academic Affairs and Athletics) was returned for lack of funding.  Apparently $1.5 million out of $2 million was taken out the University maintenance fund with no explanation.

•     The budget presentation to APSCUF has been delayed with no explanation.

•     The CPP reflects a decrease in faculty positions by about 35-40 FTE, as do preliminary budget projects [sic] that I've seen.  That is inaccurate and an update should be provided to the University community and the COT.  In all likelihood, the decrease may be 1-2 FTE faculty positions.  That means that next year's deficit is probably $3-4 million more than currently projected.  As I stated this morning and yesterday to APSCUF, I have no idea where that number came from and it is extremely problematic that Academic Affairs was NOT heavily involved in the creation of the CPP, as future construction costs for Engineering also are not accounted for.

•     There are concerns that the Engineering fees and other enhancement fees are not being used as they were intended.

_____

[1]SRU hired John Bonaguro on a contract basis to serve as the founding dean of the College of Health Professions in an interim capacity.

101.    On March 25, 2022  President Behre sent Dr. Zink a spurious email blaming her for failing to build positive relationships with peers (contrary to what was stated in the February 2022 evaluation), and confirmed Dr. Zink's complaints about "a lack of budget transparency" and "odd things going on with the budgets."

102.    Dr. Zink responded via email on March 25, 2022 complaining of President Behre's retaliation against her for speaking up as follows:

> I already have alerted the Council of Trustees that I am very concerned about retaliation from you.  The Chancellor also is aware of my retaliation concerns.  This e-mail is just another example of many.

> I have done a great job here.  My evaluation from you on Feb. 1 was glowing.

> I do have fantastic working relationships with my fellow vice presidents, the Chief Diversity, HR director, as well as APSCUF leadership.  I don't know anyone (aside from you) who has a great working relationship with Carrie [Birckbichler].  That situation predates me by many year and you know it.  Upon my arrival, one of my first conversations with you was my reporting how many people reported how difficult she is to work with.

> You are on notice that any adverse action that you take related to me will be viewed as retaliation for speaking up.  I ask that you immediately cease and desist your bullying and demeaning behaviors toward me.

103.    On March 25, 2022 Dr. Zink emailed President Behre following up on the prior report from her and other Cabinet members about wide-spread rumors another Cabinet member (Dr. David Wilmes, Chief Student Affairs Officer) was having an inappropriate affair with a direct report (Karla Fonner) who recently was promoted under unusual circumstances in violation of PASSHE's Amorous Relationship policy.

104.    Dr. Zink complained to President Behre that he failed to take any action in response to previous reports made months earlier and she implored him to initiate a formal investigation.

18

105.    Based on information and belief, in response to this email, President Behre initiated a formal investigation.

106.    On April 4, 2022 from 2:00 p.m. to 2:50 p.m., Dr. Zink was interviewed as a witness by PASSHE investigator Gretchen Mroczkowski about both the alleged financial improprieties and the amorous relationship rumors.

107.    Immediately thereafter, on April 4, 2022 at about 3:15 p.m., Dr. Zink was removed as Provost by President Behre.

108.    In the removal meeting (attended by Dr. Zink, President Behre, and Human Resources Vice President Lynne Motyl), Dr. Zink was presented with a settlement agreement and release (brief temporary assignment and resignation) and asked to sign it on the spot.

109.    When Dr. Zink refused indicating she needed legal counsel, President Behre became so angry at Dr. Zink that Ms. Motyl had to ask him to leave the room.

110.    When Dr. Zink inquired why she was removed, Ms. Motyl said she did not know because President Behre put together the "for cause" letter.

111.    Dr. Zink did not receive any formal warnings and had never been written up in her entire career.

112.    At 4:23 p.m. on April 4, 2022 the Office of the President sent the following email to all University faculty and staff re: "Michael Zieg appointed acting provost," "Effective today, Michael Zieg, associate provost for academic finance, planning and strategic initiatives, has been appointed acting provost at Slippery Rock University.  Please join me in thanking Michael for lending his skills and knowledge to this vital role.  Thank you, William J. Behre, President."

113.    The email failed to even mention Dr. Zink.

114.     Michael Zeig ("Dr. Zeig"), a younger, less-experienced, less-qualified male, was appointed interim University Provost to replace Dr. Zink.

115.     On April 8, 2022  a group of 21 faculty leaders wrote a letter of support for Dr. Zink to President Behre and the Council of Trustees (which noted President Behre's "erasure" of Dr. Zink by failing to mention her in the email announcing Zieg's new appointment), stating in part:

> [W]e are writing regarding the administrative decision earlier this week to relieve Provost Zink of her duties (because no clear communication has been made, we are uncertain about her status, itself an issue). While we do not know the details behind this decision, we know that Provost Zink has worked in often difficult circumstances, from quarantine to PASSHE reorganization to having to navigate a challenging workplace culture that we know is not always supportive of women. Her literal erasure in the announcement Monday afternoon is an insult to her work at SRU and is troubling at many levels, as is the lack of transparency by our administration regarding the circumstances around her sudden removal.
>
> We know that Provost Zink has been a supporter of DEI initiatives; without her, the 3-credit DEI requirement for undergraduates that goes live in fall 2022 might not have happened. She was a fierce supporter of this and has provided material support for the Online DEI Certification Training and its continuation.  She also supported the creation of an Associate Provost for Academic Inclusive Excellence and Experiential Learning position - a position which seems to have fallen off the radar.
>
> Finally, we are concerned more generally about the administration's practice of internal administrative hires and promotions that favor white men. Every single administrative diversity hire in the last six years has been the result of an international search, while every internal administrative appointment has benefitted someone who is white and generally male.  The pattern was repeated when Michael Zieg was appointed as acting provost.  There are so many levels at which this is troubling.  This is NOT a judgement of Michael Zieg but a critique of a process that has been oblique - while faculty searches and hires are required to adhere to clear and transparent protocols.  We are asking for greater transparency regarding policies and procedures for internal administrative hires and promotions.
>
> We recognize that personnel issues are confidential.  We are not asking for an explanation of why Provost Zink was removed from her position. Rather, we are expressing our concerns about the manner in which the decision was framed and announced and how that framing might reflect and reinforce institutional misogyny. Second, in the name of fairness and equity, we are asking you to practice

transparency in providing to faculty and staff your policies and procedures for making decisions about how administrative hires/promotions are determined.

As faculty and staff committed to equity and social justice, we feel obligated to reach out and very much hope to hear from you.

Finally, regarding the signatures below, there are 10 faculty who did not sign their names out of concerns for retaliation (itself a disturbing reality).   But their commitment is no less real and heart-felt.

116.   On April 25, 2022  Dr. Zink wrote to the Chancellor of the PASSHE system, Daniel Greenstein, to resign from her position as Provost (she had been asked to resign by Dr. Behre) and to continue at SRU as a tenured faculty member per her agreement with SRU.

117.   Dr. Behre refused Dr. Zink's resignation and terminated her employment at SRU/PASSHE effective April 26, 2022.

118.   The asserted justifications, which were pretextual considering President Behre's recent accurate evaluation for Dr. Zink's termination, including an alleged loss of confidence in her ability to lead her division and alleged loss of trust in her ability to act in a senior management role are false and not justified by Dr. Zink's actions or performance.

119.   Based on information and belief, Dr. Zink was removed as Provost and terminated for retaliatory and/or discriminatory reasons.

120.   As a result of Defendants' actions, Dr. Zink has suffered damages including loss of salary and benefits, humiliation, embarrassment, harm to her professional reputation, emotional distress, special damages associated with her efforts to obtain alternative employment, and out of pocket costs including for attorney's fees.

121.   Dr. Zink's removal as Provost and termination is part of a pattern of retaliation and discrimination.

122.    As mentioned above, on February 21, 2022  Dr. Mohammadi sent a letter to the PASSHE Chancellor's office about concerns regarding the engineering program and CPP.

123.    PASSHE hired its usual auditing firm to look into the allegations.

124.    On April 18, 2022  SRU was notified that the "fiscal review" was completed.

125.    Two days later, on April 20, 2022  Dr. Mohammadi unexpectedly was fired by President Behre.

126.    President Behre claimed that Dr. Mohammadi's position had been eliminated, which under the circumstances is false and a pretext.

127.    Based on information and belief, Dr. Mohammadi like Dr. Zink was terminated for retaliatory and/or discriminatory reasons.

128.    Dr. Zink's termination and removal from her position as SRU Provost constitute adverse employment actions.

129.    Dr. Zink suffered an adverse employment action in that she was denied the right to return to the teaching faculty and terminated from her tenured position, contrary to the prior promise of President Behre.

130.    Dr. Zink's younger and/or male colleagues were not subjected to similar adverse actions.

131.    Dr. Zink was subjected to adverse employment actions on account of her sex and age.

132.    Dr. Zink demands a jury trial.

## VI.  COUNTS

**COUNT I: RETALIATION FOR EXERCISE OF FREE SPEECH**
**Violation of 42 U.S.C. § 1983**
**Plaintiff Abbey Zink v. Defendant William Behre**

133.    The preceding paragraphs are incorporated as if set forth at length herein.

134.    President Behre removed Dr. Zink as Provost and discharged her employment because she spoke as a citizen on a matter of clear public concern in violation of Plaintiff's rights to speak freely under the First and Fourteenth Amendments of the U.S. Constitution and 42 U.S.C. § 1983.

135.    At all relevant times President Behre acted under color of state law, inasmuch as his acting as set forth at length above constitute misuse of power possessed solely by virtue of state law and made possible only because President Behre is and was clothed with the authority of state law.

136.    Dr. Zink, as a citizen, has a right to speak on matters of public concern under the First and Fourteenth Amendments of the United States Constitution.

137.    Dr. Zink's job duties did not mandate or require that she engage in such speech in the course of carrying out her job.

138.    As set forth above, Dr. Zink was acting as a citizen both speaking upon matters of public concern; therefore her speech comprised activities protected under the First and Fourteenth Amendments of the United States Constitution.

139.    Dr. Zink, as a citizen of the United States, did not surrender her rights and privileges under the United States Constitution as a condition of employment with PASSHE and SRU.

140.    As described above, Defendants fired Dr. Zink in retaliation for her exercise of her First and Fourteenth Amendment right to speak on matters of public concern.

141.    The actions of the Defendants were intentional and were undertaken with reckless disregard of Dr. Zink's federally protected rights to exercise her First Amendment rights.

142.    As a result of the Defendants' intentional actions against Dr. Zink, she has suffered and continues to suffer damages, including but not limited to, lost wages and benefits, anxiety, emotional distress, loss of reputation, loss of career opportunities, humiliation and inconvenience.

143.    The conduct by President Behre, as set forth above, constituted a conscious choice on the part of the Defendants to disregard Plaintiff's constitutional rights, and deprived Dr. Zink under color of state law of rights of speech under the First and Fourteenth Amendments of the U.S. Constitution in violation of 42 U.S.C. § 1983.

144.    As a direct and proximate result of the intentional and reckless actions of President Behre, Dr. Zink has sustained the injuries and damages set forth above.

145.    Plaintiff demands judgment against President Behre individually, and against him in his official capacity for prospective injunctive and declaratory relief including, but not limited to, reinstatement for deprivation of her rights to speak on matters of public concern and to petition for redress of grievances under the First Amendment of the U.S. Constitution and 42 U.S.C. § 1983, and damages as follows:

a.    that President Behre in his official capacity be permanently enjoined from discriminating against Plaintiff for engaging in First Amendment activities;

b.    that President Behre in his official capacity be permanently enjoined from retaliating against Plaintiff because she engaged in First Amendment protected activities;

c.    that President Behre in his official capacity be ordered to reinstate Plaintiff to the position from which she was discharged;

24

d.      that President Behre in his individual capacity be ordered to pay Plaintiff all of her lost pay and benefits;

e.      that Plaintiff be awarded against President Behre in his individual capacity compensatory damages to compensate for pain, suffering, emotional distress and humiliation she has suffered as a result of his conduct;

f.      that Plaintiff be awarded punitive damages against President Behre in his individual capacity in an amount sufficient to punish him and to deter similar conduct;

g.      that Plaintiff be awarded against President Behre, in his official and individual capacities, the costs and expenses of this litigation, and, pursuant to 42 U.S.C. § 1988, a reasonable attorneys' fee; and

h.      that Plaintiff be awarded such further relief as this Court deems to be just and proper.

**COUNT II: VIOLATION OF PROCEDURAL DUE PROCESS**
**Violation of 42 U.S.C. § 1983**
**Plaintiff Abbey Zink v. Defendant William Behre**

146.    The preceding paragraphs are incorporated as if set forth at length herein.

147.    As a tenured employee of PASSHE and SRU, Dr. Zink had both a property interest and a liberty interest in her employment which may not be deprived without due process of law.

148.    Dr. Zink was removed from her tenured position within SRU's English Department without notice or an opportunity to be heard on the propriety of her removal.

149.    President Behre, acting under color of law, violated Plaintiff's right to procedural due process of law guaranteed by the Fourteenth Amendment to the United States Constitution by his summary termination of her tenured employment.

150.    Plaintiff demands judgment against President Behre individually, and against him in

25

his official capacity for prospective injunctive and declaratory relief including, but not limited to, reinstatement and damages as follows:

    a.      A declaratory judgment that President Behre has violated Plaintiff's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and 42 U.S.C.A. § 1983;

    b.      A permanent injunction directing Defendant to reinstate Dr. Zink to her tenured position in the Department of Languages, Literatures, Cultures, and Writing.

    c.      An injunction prohibiting Defendants and their employees or successors in office from violating any of Plaintiff's federal statutory and constitutional rights;

    d.      A money judgment against President Behre to compensate Dr. Zink for all emoluments of employment to which she would have been entitled were it not for his violation of her rights;

    e.      A money judgment against President Behre for compensatory and punitive damages;

    f.      A money judgment against President Behre for all costs and reasonable attorney's fees incurred in the prosecution of this action;

    g.      All other relief that this Court may deem just and proper.

### COUNT III: VIOLATION OF SUBSTANTIVE DUE PROCESS
### Violation of 42 U.S.C. § 1983
### Plaintiff Abbey Zink v. Defendant William Behre

151.    The preceding paragraphs are incorporated as if set forth at length herein.

152.    Defendant's summary discharge of Dr. Zink from her tenured position on the basis of her speech and/or gender was arbitrary, unreasonable, and not rationally related to any legitimate interest of SRU or President Behre.

153.     By his summary discharge of Dr. Zink from her tenured position on the basis of her speech and/or gender, President Behre, under the color of law, violated Plaintiff's right to substantive due process as guaranteed by the Fourteenth Amendment to the United States Constitution.

154.     Plaintiff demands judgment against President Behre individually, and against him in his official capacity for prospective injunctive and declaratory relief including, but not limited to, reinstatement and damages as follows:

a.      A declaratory judgment that President Behre has violated Plaintiff's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and 42 U.S.C.A. § 1983;

b.      A permanent injunction directing Defendant to reinstate Dr. Zink to her tenured position in the English Department;

c.      An injunction prohibiting Defendants and their employees or successors in office from violating any of Plaintiff's federal statutory and constitutional rights;

d.      A money judgment against President Behre to compensate Dr. Zink for all emoluments of employment to which she would have been entitled were it not for his violation of her rights;

e.      A money judgment against President Behre for compensatory and punitive damages;

f.      A money judgment against President Behre for all costs and reasonable attorney's fees incurred in the prosecution of this action;

g.      All other relief that this Court may deem just and proper.

## COUNT IV: RETALIATION
### Violation of 42 U.S.C. § 1981 through 42 U.S.C. § 1983
### Plaintiff Abbey Zink v. Defendant William Behre

155.    The preceding paragraphs are incorporated as if set forth at length herein.

156.    President Behre is being sued in his individual capacity for money damages.

157.    42 U.S.C. § 1981 prohibits the impairment of contracts on the basis of race or national

origin.

158.    42 U.S.C. § 1981 further protects from retaliation individual who complain of

discrimination on the basis of race or national origin.

159.    Plaintiff brings this Section 1981 claim through 42 U.S.C. § 1983.

160.    Dr. Zink was discriminated and retaliated against for her association with and support

of Dr. Mohammadi, a senior Vice President and whistleblower at SRU, who is of Iranian national

origin and who settled an earlier discrimination case with SRU.

161.    Specifically, Dr. Zink was removed from her position as SRU Provost, was denied

the right to join the English Department faculty, and was terminated from her employment at SRU.

162.    The aforementioned adverse employment actions were the result of Dr. Zink's support

for Dr. Mohammadi.

163.    Dr. Zink seeks all remedies and damages permitted under 42 U.S.C. § 1981 through

42 U.S.C. § 1983, including, but not limited to, back pay, front pay, emotional distress, medical

harm, reputation harm damages, reinstatement, attorney's fees, costs, and pre-judgment and

post-judgment interest.

### COUNT V: DISCRIMINATION ON THE BASIS OF SEX
### Violation of Title IX (20 U.S.C. § 1681)
### Plaintiff Abbey Zink v. Defendants Pennsylvania State System of Higher Education and
### Slippery Rock University of Pennsylvania

164.    The preceding paragraphs are incorporated as if set forth at length herein.

165.    Title IX prohibits federally funded institutions of education for engaging in discrimination on the basis of sex.

166.    Both PASSHE and its component, SRU, are federally funded institutions of post-secondary education.

167.    Dr. Zink is a female and, as such, is a member of a class protected by Title IX.

168.    Dr. Zink was qualified for her position at SRU.

169.    Dr. Zink was the first female Provost at SRU.

170.    Dr. Zink was subjected to adverse employment actions when she was removed from her position as SRU Provost, when she was denied her right to join the English Department despite the fact that she had tenure, and she was terminated from her employment at SRU.

171.    Dr. Zink was replaced as Provost by a less-qualified and less-experienced  male.

172.    SRU's workplace culture is not supportive of women.

173.    Internal administrative hires and promotions have favored white men.

174.    Similarly situated male faculty members–including, but not limited to, Kurt Schimmel– were treated more favorably than Dr. Zink.

175.    Dr. Zink was subjected to less favorable treatment and to adverse employment action on account of her gender.

176.    Administrators at SRU were aware of the discriminatory activity yet did nothing to

stop it.

177.    Dr. Zink seeks all remedies and damages permitted under Title IX, including back pay, damages for lost prospective future employment, damages for prospective harm in her present position, compensatory damages for emotional pain and suffering, injunctive and declaratory relief, and payment of her litigation costs, including reasonable attorneys' fees, plus pre-judgment and post-judgment interest.

**COUNT VI: VIOLATION OF THE PENNSYLVANIA WHISTLEBLOWER LAW**
**Violation of 42 Pa. C.S. § 1423**
**Plaintiff Abbey Zink v. Defendants Pennsylvania State System of Higher Education,**
**Slippery Rock University of Pennsylvania and William Behre**

178.    The preceding paragraphs are incorporated as if set forth at length herein.

179.    A whistleblower is a "person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority."

180.    "Wrongdoing" is a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."

181.    "Waste" is an "employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources."

182.    An "employee" is a "person who performs a service for wages or other remuneration under a contract of hire, written or oral, express or implied, for an employer."

183.    Under the act, an "employer" can be a "public body" which includes: "(1) A State

officer, agency, department, division, bureau, board, commission, council, authority or other body in the executive branch of State government, (1.1) The General Assembly and its agencies, (2) A county, city, township, regional governing body, council, school district, special district or municipal corporation, or a board, department, commission, council or agency, (3) Any other body which is created by Commonwealth or political subdivision authority or which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body."

184.   Pursuant to the Whistleblower Act, "No employer may discharge . . . an employee . . . because the employee . . . makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act." 43 P.S. § 1423.

185.   Defendants are employers under the Act.

186.   Dr. Zink is a person who performed a service for wages under a contract of hire, written or oral, express or implied, for an employer under the Act, and therefore is an "employee."

187.   Dr. Zink made good faith reports verbally and in writing to her employer instances of wrongdoing and/or waste committed by her employer.

188.   Dr. Zink reported "wrongdoing" - a violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer.

189.   Dr. Zink reported "waste" - an employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources.

190.    Immediately following Dr. Zink's good faith reports of wrongdoing and/or waste, Dr. Zink was removed as Provost and terminated from her employment.

191.    The close temporal proximity between the good faith reports and the removal and discharge supports a causal connection.

192.    Defendants' asserted justifications for those adverse employment actions, such as they are, are false and pretextual.

193.    As a direct and proximate result of this unlawful and retaliatory removal and termination, Dr. Zink has suffered damages including loss of salary and benefits, humiliation, embarrassment, harm to her professional reputation, emotional distress, special damages associated with her efforts to obtain alternative employment, and out of pocket costs including for attorney's fees.

194.    Dr. Zink has also suffered damages including financial losses and emotional distress.

195.    Wherefore, Dr. Zink respectfully requests this Court to enter judgment against Defendants, as follows:

(a)    That Dr. Zink be granted all relief necessary to make her whole, including but not limited to reinstatement via injunctive relief or front pay in lieu of reinstatement, the payment of back wages, full reinstatement of fringe benefits and seniority rights, actual damages, emotional distress and reputation harm damages, costs of litigation, including reasonable attorney fees and witness fees, for her wrongful discharge; and

(b)    That this Court award such other and further relief as it deems proper

Respectfully Submitted,

LIEBER HAMMER HUBER & PAUL, P.C.

s/James B. Lieber
James B. Lieber, Esq.
Pa. I.D. No. 21748
Thomas M. Huber, Esq.
Pa. I.D. No. 83053
Jacob M. Simon, Esq.
Pa. I.D. 202610
1722 Murray Ave., 2nd Floor
Pittsburgh, PA 15217
(412) 687-2231
fax: (412) 687-3140
jlieber@lhhb-law.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2022, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which shall serve notice upon the following:

Mario R. Bardogna, Esq.
Amy H. McCrossen, Esq.
Clark Hill, PLC
301 Grant Street – 14th Floor
Pittsburgh, PA 15219
(412) 394-2487
(412) 394-2555 (facsimile)

Counsel for Defendants


s/James B. Lieber
James B. Lieber
Counsel for Plaintiff